**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| | ) | |
| v. | ) | 2:06-CR-116 PS |
| | ) | |
| | ) | |
| ANTHONY EDWARDS | ) | |

**OPINION AND ORDER**

Following an informant's tip, DEA agents arrested Defendant Anthony Edwards for possession of crack cocaine with intent to distribute. After he was taken into custody, he waived his *Miranda* rights and subsequently gave an inculpatory statement. Defendant then filed a motion to quash his arrest, arguing that the officers lacked probable cause. He also sought to suppress his statements, claiming that they were a product of a coercive environment. The Court held a hearing on January 9, 2007, and Defendant filed a supplement to his Motion on January 29, 2007. For the following reasons, his Motion is denied.

**I. FACTUAL BACKGROUND**

On July 13, 2006, DEA agents took David Beagle – the informant at issue in this case – into custody after he had sold cocaine several times to their cooperating witness. Beagle informed the agents that he was willing to cooperate and give them his suppliers, and the agents took him up on his offer. To test his reliability and trustworthiness, they questioned him about the previous controlled buys that had taken place in November 2005. Beagle truthfully answered questions about the purchases without knowing that they were government-arranged buys. Beagle also told the agents about the people who bought his drugs, and gave the agents accurate

information about when his drug sales had occurred.  Agent Trevino, a detective sergeant with the Gary Police Department assigned as a task force agent with the DEA and a thirteen-year veteran police officer, concluded that Beagle was "forthcoming" and that the information he gave was "right on."  (Tr. at 27.)

During Trevino's testimony, defense counsel obtained details regarding a specific controlled purchase from Beagle.  During that buy, Beagle had used a pay phone across the street to contact his source.  Beagle then went to pick up the cocaine, while the cooperating witness waited at Beagle's house.  Beagle returned with powder cocaine and began to cook the powder into crack in front of the cooperating witness.  Because it was taking too long to cook, the witness left with some crack cocaine and the rest in a jar.

The agents asked Beagle about his current sources of supply.  He agreed to telephone his sources to set up controlled purchases of crack cocaine.  He told the agents that it would best to contact the sources from his home as they would expect to see his home number on their caller I.D.  Consequently, the agents drove Beagle to his home to make the calls.

Beagle told the agents that one source (and the only one of concern to us) went by the name "Willie."  Beagle described him as a heavy-set black man with a dark complexion and short curly hair, and stated that he drove a dark-colored Cadillac.  Beagle also said that he sometimes had to call Willie a few times, but that Willie usually brought the drugs within the hour.  According to Beagle, it was Willie's habit to  park in the alley behind Beagle's detached garage when delivering the cocaine.  Willie would then call, informing Beagle that he was in the alley.  If Beagle took some time to come out to the car, Willie would leave the alley and circle the block because he didn't like to stay parked for too long.

2

Beagle called Willie in the presence of the agents at approximately 4:00 pm. He called from the basement in his home, which did not have a view of the alley. Beagle told Willie that he needed a certain amount of crack. Willie told Beagle that he would arrive at Beagle's house shortly. After waiting 15-20 minutes, Beagle made a follow-up phone call, and Willie stated that he would be there in about 15 minutes.

Consistent with Beagle's prediction, between 4:45 pm and 5:00 pm, a dark-colored Cadillac with two African-American men pulled into the alley. Trevino, who was peering over the fence in Beagle's backyard, did not see the car initially pull into the alley but did see the car pull behind Beagle's garage. At this point, Trevino could see the driver's side of the vehicle, and noted that the driver matched Beagle's description of Willie. Agent Trevino called the agents in Beagle's basement and told them that a car had just pulled behind the garage. The agents in the basement told Trevino that Beagle had just received a phone call from Willie who stated that he was in fact behind Beagle's home.

The Cadillac began to leave the alley after a couple minutes of being parked. A Hammond police car pulled into the alley behind the Cadillac and put on its siren, and the Cadillac eventually stopped. Hammond police then arrested and searched both occupants of the car sometime between 4:45 and 5:00 pm.[1] The driver was identified as Defendant Edwards.

Defendant, who testified during the motion to suppress hearing, claimed that he didn't own a car at the time of his arrest, but was driving his fiancé's car. She had owned the car for only a couple months. Defendant stated that he and his brother went to Taco Bell and used the

---

[1] Mansfield estimated the time of arrest between 4:30 and 4:45 pm, whereas Trevino placed the time of arrest between 4:45 pm and 5:00 pm.

drive-thru.  As they were getting ready to drive onto the highway, they stopped at an alley to go to the bathroom.  Defendant had been a victim of a shooting in his stomach and leg and as a result, often had an urgent need to use the bathroom.  Once in the alley, he saw the police car behind him, was pulled from the car by officers with guns drawn, was thrown down on the ground, and was handcuffed.  The officers did not inform Defendant why he was arrested or where he was being taken.

Defendant also testified that his cell phone number was different than the one used by Beagle to make the drug purchase.  However, a number of cell phones were found in the car.  Defendant countered, somewhat incredibly, that these were already in the car when his fiancé bought it.

Defendant was taken to a holding cell at the Hammond Police Department.  Meanwhile, DEA Agent Melvin Mansfield went to the Hammond Narcotics Bureau to receive his assignment, which was to begin to interview Defendant with Agent Kelly Carroll.  This trip from the place of the arrest to the Bureau took about 10-12 minutes.  Mansfield then traveled to the Hammond Police Department, which took approximately five minutes.

Mansfield and Carroll began to question Defendant.  They began by asking him standard booking questions such as his name, social security number, and date of birth.  He did not give any nicknames, including Willie, when asked.  The agents then advised him of his *Miranda* rights.  Carroll orally read each *Miranda* right and the waiver in the *Miranda* advisement form to Defendant.  After doing so, Carroll placed the form in front of Defendant, and asked Defendant to read and initial each right if he understood it.  Defendant initialed each right and also a general statement regarding the waiver of his rights.  He printed and signed his name at the bottom of the

4

waiver sheet. When asked if he had any questions, Defendant replied no. Mansfield testified that Defendant was "clear and coherent" when reviewing the waiver form. (Tr. at 14.) The waiver form was signed at 6:36 pm.

According to Defendant, he only glanced at the waiver form and did not read it. He denied that the agents read the form to him. Instead, they told him where to place the initials and sign, and he just did what he was told. He testified that, if he had understood what the waiver form meant, he would not have initialed and signed it.

While Defendant was with the agents, he asked to make a phone call to his family because his family would be concerned about what happened to him and his brother. He was told that he could make the call once the interview was completed. Furthermore, Defendant testified that he asked to speak to a lawyer two or three times.[2] The agents began by asking Defendant about the evening's earlier events. The agents quickly came to the conclusion that Defendant was fibbing and so they placed him back in the holding cell. Mansfield estimated that he and Carroll talked to Defendant for about 15 minutes. The agents then questioned his brother, who immediately invoked his right to counsel.

Thirty to forty minutes after Defendant waived his *Miranda* rights, Trevino, who had returned to the Hammond Police Department, began to interview Defendant. Trevino showed Defendant the *Miranda* waiver form that he had previously initialed and signed, and asked him if he understood the rights that were read to him earlier. Defendants answered yes, and Trevino proceeded to interrogate him; Defendant then made incriminating statements. According to

---

[2] Defendant provided an affidavit to the Court. He did not state in his affidavit that he had asked for a lawyer during his interview.

5

Trevino, Defendant did not ask for a phone call or a lawyer.

Defendant Edwards, during his testimony, described his complexion as medium, whereas his sister, for example, was dark-complexioned. He also testified that his hair was real short, not curly, and shaved close to his head at the time of the arrest. The government, however, provided his arrest photograph in rebuttal, which showed that Defendant's hair was not shaved close to his head, but rather showed it as being short and curly. In his affidavit, Defendant denied knowing anyone named David Beagle, but this was not raised during Defendant's live testimony.

## II. DISCUSSION

Defendant raises two claims in his Motion to Suppress. First, he argues that the agents did not have probable cause to arrest him because the informant was unreliable and the agents failed to corroborate the informant's allegations. Second, Defendant asserts that he did not knowingly and voluntarily waive his *Miranda* rights. The Court will address each claim in turn.

**A.     Probable Cause for Arrest**

In order to make an arrest without a warrant, the police must have probable cause to reasonably believe that a particular individual has committed a crime. *United States v. Oliva*, 385 F.3d 1111, 1114 (7th Cir. 2004). To determine whether or not probable cause for a search or arrest existed, we must review the totality of the circumstances to determine "whether, given all of the circumstances set forth . . . , there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Id*. (quoting *Illinois v. Gates*, 462 U.S. 213, 238 (1983)). This determination is a practical and common-sense inquiry. *United States v. Huebner*, 356 F.3d 807, 813 (7th Cir. 2004). It involves asking whether the officer was acting on reasonably trustworthy information suggesting that the suspect was committing an offense.

6

*United States v. Navarro*, 90 F.3d 1245, 1254 (7th Cir. 1996).

Probable cause may be based on information given by an informant provided that the informant is reliable. *United States v. Rosario*, 234 F.3d 347, 350-51 (7th Cir. 2000). "Reliability may be shown by the informant's past record of reliability, through independent confirmation or personal observation by the police, or by other methods." *United States v. Gilbert*, 45 F.3d 1163, 1166 (7th Cir. 1995). To determine whether probable cause exists, both with respect to the informant's veracity and reliability and as a basis for the information and with respect to the degree it has been corroborated, we must consider the totality of circumstances. *Edwards v. Cabrera*, 58 F.3d 290, 293 (7th Cir. 1995).

Here, Beagle (the informant) provided several details to law enforcement, all of which were confirmed by agents who personally observed Defendant's behavior. First, Beagle set up the drug deal over the phone in the agents' presence. Beagle stated that his supplier was a heavy-set, black man with a dark complexion and short, curly hair who drove a dark-colored Cadillac. Defendant arrived at the scene of the drug transaction meeting that description: he was a heavy-set, black man who had short, curly hair and was driving a dark-colored Cadillac. The photograph taken during his booking also depicted Defendant as a heavy-set black man with short, curly hair – despite his testimony to the contrary.

Second, Beagle told the agents that the source usually parked in the alley behind his house when delivering the drugs. As expected by the agents, Defendant, who fit the source's description, parked his dark-colored Cadillac in the alley behind Beagle's garage.

Third, the timing of the arrival of the Cadillac fit into the time frame established by Beagle's telephone conversations with his source. Beagle had told the agents that he sometimes

needed to call Willie more than once but that generally he showed up within thirty to sixty minutes. Sure enough, Beagle called Willie around 4:00 pm, waited for about 15-20 minutes, called again, and was told that Willie would arrive within the next 15 minutes. Defendant then showed up in the alley 15 minutes later.

Next, Beagle told the agents that, in the past, Willie would leave and drive around the block if Beagle took too long to meet Willie in the alley. Just as Beagle predicted, Trevino saw the Cadillac begin to pull out of the alley after it had been parked for a couple minutes.

Finally, Beagle received a phone call from Willie, who told Beagle that he was waiting in the alley. Beagle previously had told the agents that Willie typically called Beagle when he had pulled into the alley for the drug delivery. This phone call took place just after Defendant's Cadillac pulled into the alley.

Beagle not only described an individual that looked like Defendant but also predicted Defendant's future behavior. *See Huebner*, 356 F.3d at 814 ("Insofar as [Defendant's] actions mirrored [informant's] prediction of this event, it became clear that [informant] indeed possessed 'inside information,' further establishing his reliability."); *cf. Alabama v. White*, 496 U.S. 325, 332 (1990) (permitting use of anonymous telephone tip where "significant aspects of the caller's predictions were verified"). Based on all the corroborating personal observations of the agents, Beagle's information was reliable, and, when looking at the facts and circumstances known to the agents, they plainly had probable cause to arrest Defendant. *See Rosario*, 234 F.3d at 351 (holding that untested informant was reliable where agents were able to corroborate information provided by informant prior to arrest and search of defendant). All that is required is "'a probability, not a prima facie showing, of criminal activity" . . . to establish probable cause, and

8

that standard is met here." *Id.* (citing *Gates*, 462 U.S. at 235).

Defendant make several arguments in support of his motion to suppress. First, he claims that an uncorroborated allegation of an informant is insufficient to establish probable cause. But as seen above, Beagle's allegations were confirmed by the agents' personal observations. *See United States v. Ganser*, 315 F.3d 839, 843 (7th Cir. 2003) ("If an informant is shown to be right about some things, he is probably right about other facts that he has alleged, including the claim that the object of the tip is engaged in criminal activity.") (citation and internal quotations omitted).

Defendant also makes much of the fact that the way Beagle obtained his drugs in the initial buys (which resulted in Beagle's arrest) was different than the way he told the agents he obtained drugs when he was cooperating. But Trevino explained that the earlier drug sales by Beagle were months before his July 13 cooperation and involved a different commodity – the earlier source sold only powder cocaine, while Beagle arranged to buy crack cocaine from Willie. Furthermore, Beagle told Trevino that Beagle had begun dealing with other sources since November 2005. The agent's explanation for the reasons for the distinctions in purchasing is credible, particularly in light of the police corroboration of Beagle's specific information regarding his current source.

Second, Defendant asserts that he and his brother were not doing anything illegal when the officers stopped and arrested them – they were simply parked in the alley and then began to drive away. The agents needed to "reasonably believe, in light of the facts and circumstances within their knowledge at the time of the arrest, that the suspect had committed or was committing an offense." *United States v. Parra*, 402 F.3d 752, 763-64 (7th Cir. 2005) (citation

9

omitted). After observing that Defendant's behavior conformed exactly to what Beagle had forecasted, the agents had reasonable belief that Defendant was supplying drugs to Beagle, their informant. *See Huebner*, 356 F.3d at 814-815 (noting that "'seemingly innocent activity' was properly deemed suspicious by the observing officers" in light of the informant's tip"); *Navarro*, 90 F.3d at 1254 ("actual evidence of narcotics is not required in a probable cause determination.").

Next, Defendant relies heavily on case law regarding the reliability of anonymous tipsters but those cases are simply not on point. Beagle was *not* anonymous. The agents knew exactly who he was – a known cocaine street dealer who obtained his drugs from some source. The information from the known informant was appropriately confirmed by the agents, and not similar to situations where anonymous callers provide unverifiable information.[3] *See Gilbert*, 45 F.3d at 1167 ("The mere fact [the informant] had made a deal with the police does not undermine his reliability, especially in light of [the police officer's] confirmation of the information and the fact that [the informant] implicated himself as well as [the defendant] in the prior burglaries.").

Finally, Defendant claims that Trevino could not have seen the driver of the Cadillac because he did not see the driver use a cell phone. Therefore, the argument goes, Trevino would not have had a chance to match Willie with Beagle's description. Simply because Trevino did not see Defendant use a cell phone does not mean that Trevino did not actually see Defendant.

---

[3] Defendant also alleges that the "cell phone number Beagle provided to the agents for Willie[] was not the cell phone number for Mr. Edwards's cell phone." (Def. Supp. Mem. at 3.) Probable cause is assessed at the moment of the arrest, not based on what officers later may learn. *See Tangwell v. Stuckey*, 135 F.3d 510, 517-19 (7th Cir. 1998). In any event, this is simply another fact that goes into the calculus, and it's not a particularly persuasive one at that inasmuch as several cell phones were found in the car.

10

Defendant may have called Beagle as he entered the alley.  Notably, Trevino admits that he did not see the Cadillac pull in the alley; rather, he only saw the car park behind Beagle's garage.  It is completely reasonable that Defendant made the phone call to Beagle as he entered the alley but before he came into Trevino's line of sight.  We therefore don't find the fact that Trevino did not see Defendant using a cell phone persuasive.

In sum, the probable cause in this case is nearly overwhelming.  The agents prudently determined that Defendant was committing an offense in their presence, and his arrest was proper.

**B.     Waiver of *Miranda* Rights**

Defendant has taken a scattershot approach in challenging the waiver of his *Miranda* rights.  None of his arguments has any merit.  Defendant first claims that he was not given his *Miranda* rights before the interview began.  He complains that the agents asked several questions seeking biographical information prior to reviewing the waiver form.  But these types of questions – which have come to be known as "booking questions," *see Pennsylvania v. Muniz*, 496 U.S. 582, 600-02 (1990) – can be asked notwithstanding *Miranda*.  This is because they are not likely to elicit an incriminating response from the suspect, and therefore they are not considered "interrogation."  *See United States v. Johnson*, 415 F.3d 728, 731 (7th Cir. 2005).  Thus, questions regarding Defendant's name, address, social security number, and date of birth are not questions seeking an incriminating response.  Accordingly, the agents need not have advised Defendant of his *Miranda* rights before obtaining this type of biographical information. *See United States v. Westbrook*, 125 F.3d 996, 1002-03 (7th Cir. 1997); *United States v. Reyes*, 225 F.3d 71, 76-77 (1st Cir. 2000); *United States v. Foster*, 227 F.3d 1096, 1103 (9th Cir. 2000).

Defendant next argues that his statements made to the agents "were the product of the coercive environment of the police station, fear for the well-being of his brother, and concern about his own vulnerability to law enforcement based upon how they had treated him up until the time of questioning." (Def. Mot. at 4.)  He points to several factors that contributed to his coercive environment: (1) he had never had such an encounter with law enforcement officials, specifically, the way he was arrested, and that frightened him; (2) no one told him why he was being arrested or where he was being taken, and was nervous because he didn't understand what was going on; and (3) he was denied a phone call to his family, and was worried that his family didn't know his or his brother's whereabouts.  Thus, Defendant claims that he was psychologically intimidated into signing the waiver form without understanding it.  Defendant also claims that the agents' narration of their time estimates from the arrest to Defendant's interview with Trevino leaves an hour unaccounted for, thus demonstrating that the form was not signed until some time after Defendant was questioned.

A defendant may waive his entitlement to the rights articulated in *Miranda* provided the waiver is made voluntarily, knowingly, and intelligently.  *See Edwards v. Arizona*, 451 U.S. 477, 482 (1981).  We assess this question in light of the totality of the circumstances.  *Sweeney v. Carter*, 361 F.3d 327, 331 (7th Cir. 2004).  Courts typically consider, among other factors, the defendant's background and conduct, his mental and physical condition, the duration and conditions of the detention, the attitude of the police, and whether the police utilized physical or psychological coercion.  *United States v. Jackson*, 300 F.3d 740, 748 (7th Cir. 2002).  "We analyze coercion from the perspective of a reasonable person in the position of the suspect."  *United States v. Spruill*, 296 F.3d 580, 589 (7th Cir. 2002).

12

Based upon the totality of the circumstances, the Court finds that Defendant knowingly, intelligently and voluntarily waived his *Miranda* rights.  The record does not reflect that he was subjected to a prolonged detention or lengthy questioning.  Furthermore, Defendant presented no evidence that his background or mental or physical condition would affect his ability to voluntarily and knowingly waive *Miranda* rights.  Merely because Defendant was nervous and scared by the situation he put himself in  – after all, he was under arrest  – did not result in a coercive environment.  *See Navarro*, 90 F.3d at 1258 (affirming district court's finding that atmosphere during interview was not coercive and that defendant's nervousness during interview did not lead to involuntary waiver); *United States v. Duran*, 957 F.2d 499, 502-03 (7th Cir. 1992).  Moreover, the fact that the agents may have used some force in effectuating Defendant's arrest does not inevitably lead to a finding of involuntary waiver.  *See Watson v. Detella*, 122 F.3d 450, 454 (7th Cir. 1997) (finding that *Miranda* waiver was voluntary even though Defendant was injured during arrest).  When it most mattered – right before the interrogation – Defendant has not presented a shred of evidence that he was physically or psychologically threatened or abused into signing the waiver form.

Also, the Court does not find the "missing hour" argument compelling.  Lapses in memory can easily account for the discrepancy.  What the Court does find persuasive is that Defendant spent only a few hours in custody (and was not continuously interrogated during this time) before his inculpatory interview with Trevino began.  *See United States v. Doe*, 149 F.3d 634, 639 (7th Cir. 1998) (two hours of questioning handcuffed in the back of police car in remote location not sufficient to find waiver involuntary).

Most importantly, we note that Defendant signed and initialed a written consent form

13

waiving his *Miranda* rights.  We believe Mansfield's testimony that his colleague Carroll read through the document, asked Defendant also to read it, and asked Defendant to initial each right and the waiver if he understood them.  Defendant never posed any questions about his rights or the waiver to the agents, or told the agents that he didn't understand his rights.  This signed waiver form, under these circumstances, factors heavily in finding that Defendant understood and knowingly and voluntarily waived his *Miranda* rights.

Finally, Defendant highlights that Trevino did not review the waiver form again but rather simply showed the form to Defendant and asked him whether he remembered and understood the rights that had been read to him about a half an hour before.  Defendant answered yes.  Nothing more is needed.  *See Baskin v. Clark*, 956 F.2d 142, 146 (7th Cir. 1992) (finding that a lapse of half an hour between reading the *Miranda* waiver and the inculpatory statement does not result in an involuntary waiver); *United States v. Diaz*, 814 F.2d 454, 460 n.6 (7th Cir. 1987) (statement did not violate *Miranda* where the defendant was advised of his rights "several hours earlier.").  Indeed, Defendant received a second opportunity to inform the government that he wished to invoke his *Miranda* rights or that he didn't understand them.  He failed to do either.

Defendant's third claim is that he invoked his right to counsel two or three times during his interview.  Both Mansfield and Trevino testified that Defendant never asked for counsel.  To decide this swearing contest, the Court must make a credibility determination.  We credit the testimony of the two agents over Defendant.  Mansfield testified that if Defendant had requested an attorney, the agents would have stopped the interview.  The Court believes this testimony as the agents did exactly that when Defendant's brother invoked his right to counsel.  Furthermore, we find Defendant's testimony generally less credible as his booking photograph directly

14

contradicted his description, under oath, of himself.  Accordingly, we accept the agent's testimony that Defendant never invoked his right to counsel.

### III.  CONCLUSION

For the above reasons, Defendant's Motion to Suppress [DE 22] is **DENIED**.

**SO ORDERED.**

ENTERED: February 14, 2007

s/ Philip P. Simon
PHILIP P. SIMON, JUDGE
UNITED STATES DISTRICT COURT
